IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| CORINTHIAN "COREY" BURNS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| V. | ) |
| | ) |
| THE CITY OF WAUKEGAN; WAYNE WALLES; SAM CUNNINGHAM; OFFICER ANDRES ULLOA; OFFICER DOMENIC CAPPELLUTI; OFFICER. JAROSLAW GRZEDA; OFFICER ALFONSO CANCINO; LAKE COUNTY, Illinois; MICHAEL NERHEIM; CLAUDIA KASTEN and JEFFREY PAVLETIC | ) |
| | ) |
| Defendants. | ) |

**COMPLAINT AT LAW**

NOW COMES Plaintiff, CORINTHIAN "COREY" BURNS (hereinafter referred to as ("COREY"), by and through his attorneys, O'CONNOR LAW FIRM, LTD. and alleges the following against Defendants THE CITY OF WAUKEGAN, OFFICER WAYNE WALLES (hereinafter referred to as "WALLES") , OFFICER ANDRES ULLOA (hereinafter referred to as "ULLOA"), OFFICER DOMENIC CAPPELLUTI (Hereinafter referred to as "CAPPELLUTI"), OFFICER JAROSLAW GRZEDA (hereinafter referred to as "GRZEDA"), OFFICER ALFONSO CANCINO (hereinafter referred to as "CANCINO") LAKE COUNTY, Illinois, MICHAEL NERHEIM (hereinafter referred to as "NEIRHEM"), CLAUDIA KASTEN (hereinafter referred to as "KASTEN"), and JEFFREY PAVLETIC (hereinafter referred to as PAVLETIC), for the reasons set forth below:

## INTRODUCTION

1. Plaintiff, COREY, was wrongfully charged and arrested for five felony counts including the murder of Daiyon Bolden on July 13, 2018.

2. COREY did not commit the crimes and there was not one piece of physical evidence connecting him to the criminal offenses. The only evidence that tied COREY to the murder was a false confession and false evidence concocted and coerced by the Defendants.

3. Plaintiff's "confession" was a direct result of ULLOA providing several false statements and details of the crime throughout the interview in order to deceive and manipulate the Plaintiff.

4. Nonetheless, based of Plaintiff's unlawfully coerced confession and the Defendants' false statements, Plaintiff was wrongfully arrested and incarcerated from July 13, 2018, to November 22, 2019.

5. Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that Plaintiff has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION

6. The jurisdiction of the court is invoked pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983; the Judicial Code, 28 U.S.C. § 1331, § 1343, and § 1391(b); the Constitution of the United States; and this Court's supplementary jurisdiction powers pursuant to 28 U.S.C. § 1367.

7. Defendants at all times relevant were residents of the State of Illinois. The acts complained of in this complaint occurred in Waukegan, Illinois. Accordingly, venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. §1391.

**PARTIES**

8. Plaintiff, COREY, was a minor at the time of the incident. He is currently full age and is a resident of the State of Illinois.

9. Defendant City of Waukegan is an Illinois municipal corporation that is or was the employer of Defendants, ULLOA, CAPPELLUTI, GRZEDA, CANCINO, WALLES and SAM CUNNINGHAM. Furthermore, defendant, CITY OF WAUKEGAN, is a necessary party and is responsible for judgment.

10. Defendant, ULLOA, was at all times relevant a Waukegan Police officer, a resident of the State of Illinois and hereto employed by and acting on behalf of THE CITY OF WAUKEGAN. ULLOA is sued in both individually and in his official capacity.

11. Defendant CAPPELLUTI , was at all times relevant a Detective with Waukegan Police officer, a resident of the State of Illinois and hereto employed by and acting on behalf of THE CITY OF WAUKEGAN. CAPELUTTI is sued in both individually and in his official capacity.

12. Defendant, GRZEDA , (hereinafter “GRZEDA”) was at all times relevant a Detective with Waukegan Police officer as well as the “designated”

Juvenile Advocate for COREY, a resident of the State of Illinois and hereto employed by and acting on behalf of THE CITY OF WAUKEGAN. GRZEDA is sued in both individually and in his official capacity.

13. Defendant CANCINO, was at all times relevant an Officer with Waukegan Police officer, a resident of the State of Illinois and hereto employed by and acting on behalf of THE CITY OF WAUKEGAN

14. Defendant, WALLES, is the former Police Chief of the Waukegan Police . Defendant, WALLES, was responsible for supervising officers of the Waukegan Police Department. WALLES was at all times relative a resident of the State of Illinois and hereto employed by and acting on behalf of THE CITY OF WAUKEGAN. WALLES is sued in his official capacity.

15. Defendant, SAM CUNNINGHAM, (hereinafter "CUNNINGHAM") is the former Mayor of Waukegan . CUNNINGHAM was at all times relative a resident of the State of Illinois and hereto employed by and acting on behalf of THE CITY OF WAUKEGAN.

16. Defendant, LAKE COUNTY is a county of the State of Illinois, LAKE COUNTY is obligated by Illinois statute to pay any judgment entered against Defendants, NEIRHEIM, KASTEN, MIESTER, and PAVLETIC. Lake County is liable for all torts committed by these Defendants while employed by the Lake County States Attorney Office pursuant to the doctrine of *respondeat superior*. LAKE COUNTY is additionally responsible for the policies and practices of LAKE COUNTY.

17. Defendant, PAVLETIC was the former Chief Deputy State's Attorney for the Lake County State's Attorney's Office.

18. Defendants, KRISTEN KASTEN are former Assistant State's Attorneys for the Lake County State's Attorney.

19. With the exception of the defamation of Plaintiff by Defendants, NERHEIM, PAVLETIC, and KASTEN described below, each of the individual Defendants acted under color of law and within the scope of his/her employment. Each of the Individual Defendants are sued both individually as well as official capacity.

**FACTS**

20. On July 13, 2018, COREY attended the annual Scoop the Loop event in Waukegan (hereinafter referred to as "Scoop") with Reginald Ingram and Christopher Huley.

21. COREY is a black male, had short dreadlock styled hair and was wearing camouflage pants and a black hoodie while attending the Scoop the Loop event.

22. At some point in the evening, a fight broke out at or near Genesee and Clayton Avenue between two groups of friends—Daiyon Bolden and his friends and Versean Manor and his friends. COREY was not involved in the fight. Waukegan police arrived and the groups dispersed.

23. When COREY, Reginald Ingram, Versean Manor and Christopher Huley were leaving the Scoop, they crossed paths with Daiyon Bolden, Davion Godbolt, Bryan Young and unknown others.

24. Daiyon Bolden and his group pointed towards Versean Manor and his group saying something like, "There they are" and began moving towards them when someone began shooting a gun.

25. Everyone including COREY began running away from the gunshots. Erich Sanchez, an innocent bystander, was hit in the leg and Daiyon Bolden was hit in the head and subsequently died in the hospital.

26. Waukegan Police Officers arrived on scene and a massive and chaotic investigation ensued.

## Witness Statements

27. Witnesses on the scene gave conflicting descriptions of shooter's clothing, including but not limited to red, blue, white and/or black shirts, a black hoodie, red pants, ripped/shredded jeans, black pants, and/ or shorts. The shooter was described as a young, Black male. Different descriptions of the shooter's hair were given to the police. Witnesses also gave conflicting statements as to how many young men were involved, including 1, 2, and/or 3 or 4.

28. When officer Rigoberto and Sgt Elias interviewed shooting victim Erich Sanchez, he was unable to identify the shooter. He identified the shooter as wearing red pants and a blue hoodie.

29. Witness, Daisy Sanchez, told Officer Keating she believed the shooter was wearing a navy-blue hoodie and red True Religion pants.

30. Witness, Daniel Abarca told Officer Rigoberto Amaro the shooter was wearing ripped/shredded pants.

31. Five separate witnesses were shown a photo lineup of COREY and none of them picked him from the photo lineup.

32. Witness, Bryan Young, states the shooter was wearing a black hoodie and black pants but did not know if he could identify him in a line up.

33. Witness, Mark Combs tells Officer Smith the shooter was wearing a blue-collar shirt, and "possibly shorts."

34. Witness, Davion Godbolt was with Daiyon Bolden at the time of the shooting. He positively and emphatically identified Versean Manor a/k/a Veno Gambino (hereinafter referred to as "Veno"), to Officer Navarro, as the shooter. He knew him from Facebook and showed officers his photograph on Facebook. He is shown a photo lineup and positively identifies Veno as the shooter.

35. Versean Manor a/k/a Veno Gambino was wearing a black hoodie, black pants and has long dreads.

36. Witness, Hugo Medina told officer Alfonso Avila he did not see the weapon but saw the offender reach back with his arm. He identified the shooter as wearing white shirt. He was driven home by GRZEDA after speaking with officers.

37. Immediately after the shooting, the crowd dispersed in every direction. Minutes after the incident, Officer Mahoney stopped COREY and Reginald Ingram, while they were walking northbound, approximately 2 blocks from the scene.

38. COREY and Reginald Ingram were stopped, searched, and detained.

The minors were handcuffed and held on the curb.

39. A police officer may stop a person for investigative reasons when the officer reasonably believes that the person is committing, is about to commit, or has committed an offense. 725 ILCS 5/107-14; Terry v. Ohio, 392 U.S. 1 (1968); People v. Scott, 148 Ill.2d 479 (1992).

40. The officer must be able to articulate facts leading to something more than an inchoate and unparticularized hunch. Alabama v. White, 496 U.S. 325,329 (1990); Scott, 148 Ill.2d at 503.

41. In the instant case, the officer did not have a reasonable suspicion that either minor had been or was about to be involved in criminal activity. The officer was responding to a dispatch with several conflicting descriptions of the involved parties. The officer located the Minor and one other individual doing nothing unusual or illegal. The officer then executed a Terry stop.

42. The stop of the Minor was unlawful, and any evidence discovered as a result of said stop should have been suppressed including any items of property later recovered from the Minor's person, statements made by the Minor while in custody and any show-up identifications of the Minor.

43. The officer did not have probable cause to stop the Minor, and therefore no

authority to proceed to a detention and show-up identification.

44. COREY and Reginald Ingram were paraded out in the street, in handcuffs, for several show-up identifications.

45. The witnesses did not have ample time to view the suspect(s). It was

dark. It was crowded. The shooting happened in a matter of seconds, without warning. All of the people in the area ran in every direction. The suspect(s) ran quickly away from the area.

46. "Mere suspicion" that the person has committed the offense is insufficient basis for arrest. See Henry v. United States (1959), 361 US. 98, 80 S.Ct. 168, 4 L.Ed.2d 134

47. Five factors are to be considered in determining eligibility: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty by the witness at-the confrontation; (5) the length of time between the crime and the confrontation. People v. Neal, 155 Ill.App.3d 340 (1987).

48. Under the totality of the circumstances, the show-up confrontation was so inherently unreliable that it violated the Minor's right to due process of law under the United States Constitution and the Constitution of the State of Illinois.

49. Mark Combs was the first witness to be manipulated by police officers to identify COREY as the shooter at the show-up. Mr. Combs gives no clothing description and says he did not see the shooter's face. Mr. Combs gave no certainty prior to the show-up of his ability to identify the shooter. For all of these reasons, his identification of the Minor was unreliable.

50. Hugo Medina was the second witness to be manipulated by police officers to identify COREY as the shooter at a show-up identification. Mr.

Medina does not describe the shooter's clothing or any other features. When asked if he could identify the shooter, he was unsure. Despite Mr. Medina’s uncertainty, officers continued to ask whether COREY was the shooter during the show-up trying to convince the witness to identify COREY as the shooter, which he ultimately did, despite his uncertainty. Mr. Medina initially indicated that COREY was seen near the shooter, yet CANCINO proceeded to announce that there was a positive identification of COREY as the shooter. For all of these reasons, his identification of COREY was unreliable.

51. Roque Woods was the third witness to be manipulated by police officers to identify COREY as the shooter at a show-up identification. While speaking with CANCINO, Mr. Woods explained that he was running after he heard gunshots and he was unable to identify the shooter because there were 3-4 people seen running. Despite Mr. Woods’ actual statement, CANCINO continued to question him and repeatedly indicated that he had a positive identification of COREY to others via radio. For all of these reasons, his identification of COREY was unreliable.

52. Due to the unreliability of the show-up identifications, any witness testimony in court as to the identification of the Minor, COREY as the offender will be the product of the out-of-court identification, rather than the witnesses' own independent observations. Several witnesses changed their statements regarding the color of the shooter or information regarding the identification of the shooter after speaking to officers that asked heavily suggestive questions to support their concocted narrative as evidenced by inconsistent statements.

53. To allow a witness to make an in-court identification of the Minor under these circumstances would violate the Minor's constitutional rights to due process and fundamental fairness under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. People v. Blumenstine, 42 Ill.2d 508,250 N.E.2d 152 (1969).

54. COREY was taken into custody by several Waukegan Police Officers near the corner of Genesee and Julian Streets, Waukegan, Illinois at approximately 11:00 pm.

55. Subsequent to his arrest, COREY was taken to the Waukegan Police Department and placed in a cell. He was then taken to an interrogation room in the basement of the building. There he was interrogated by Detectives ULLOA and CAPPELLUTI, beginning at approximately 1:55 a.m. on July 14, 2018.

56. When a juvenile is arrested and taken into temporary custody, Illinois police officers are required to "immediately make a reasonable attempt" to contact a parent or guardian, no attempt was made to contact COREY's parent/guardian until 2:14 a.m.

**THE INTERROGATION OF CORINTHIAN "COREY" BURNS**

57. 705 ILCS 405/5-401.5 (a-5) sets forth the language that must be used to inform a juvenile of his or her rights prior to a custodial interrogation.

58. At approximately 1:58 a.m. ULLOA begins to read a Juvenile Miranda warning to COREY.

59. ULLOA deviates from the language set forth in the statute.

60. When ULLOA asked the first statutorily required question, “Do you want to have a Lawyer?” COREY responds “yeah, probably in a little, yeah, I want to have a lawyer.”

61. Despite the clear invocation of his right to counsel, ULLOA continued to question COREY without providing counsel or even taking a break in interrogation.

62. The questions asked by the detective regarding COREY's desire to have counsel do not conform with constitutional protections.

63. At the time of the interrogation, ULLOA had not seen any videos of the incidents he is interrogating COREY about. He lies numerous times stating that he has seen a video showing COREY to be the shooter. He describes the imaginary video at length, remaking that it shows COREY’s shooting Dai Yon Bolden.

64. At the time of the interrogation, ULLOA knew there had been no results obtained from the gunshot residue analysis performed on COREY, yet he repeatedly lies to him, saying they had conclusive results of gunshot residue from him showing he discharged a firearm.

65. COREY consistently denies shooting the gun and asks ULLOA how it could be possible.

66. At the time of the interrogation, ULLOA knew no firearm had been recovered in connection with this incident, yet he lies repeatedly to COREY, stating that, not only had a gun been recovered, that COREY’s fingerprints were on it.

67. At the time of the interrogation, ULLOA knew that there were not ten witnesses who had identified the COREY as the shooter. ULLOA simply invented those people, then repeatedly confronted the COREY with their imaginary statements. He gave detailed descriptions of these pretend witnesses, their occupations and what they had seen.

68. After Detective ULLOA interrogated COREY, CAPPELLUTI took over questioning him at approximately 5:00 a.m. Like ULLOA, CAPPELLUTI lied to the COREY. He described a conversation that he had with Reginald Ingram; a person who had been arrested with the COREY. He attributed quotes to Reginald Ingram that were complete fabrications. He described having recovered videos from a bar at the scene of the shooting when no such videos existed. He also claimed that he had video of the COREY running with a gun after the shooting which likewise did not exist.

69. The individual and cumulative effect of these numerous lies and deceptions made by the police during the course of this interrogation was to overwhelm COREY's free will and to render his statement involuntary.

70. During both of these interrogations, GRZEDA was present in the interrogation room, allegedly acting as the COREY's "advocate". As a Juvenile Advocate, GRZEDA's role was to assist and/or protect the Plaintiff. This advocacy is especially needed in situations where a juvenile does not understand something while being interrogated. Instead of taking any steps at all to advocate for Mr. Burns, Officer GRZEDA sat silently in the room and watched idly as COREY's

constitutional rights were being violated.

71. At no point during either interrogation does GRZEDA make any attempt to assist the COREY. When COREY requests an attorney, GRZEDA fails to either find an attorney for the COREY or stop the interrogation. When Detective Ulloa asks questions not in compliance with the statute, GRZEDA fails to correct him. When COREY appears visibly upset and crying at approximately 2:40 a.m., GRZEDA makes no effort in intervene. GRZEDA never expresses any concern about interrogating a barely 15-year-old child beginning at 2:00 a.m.

72. GRZEDA abandons his supposed role as the juvenile's advocate when he joins in the interrogation at approximately 4:36 a.m., asking the COREY a series of questions And GRZEDA never makes any attempt to stem the flow of lies coming from either ULLOA or CAPPELLUTI during the COREY's interrogation. GRZEDA actively participated in the investigation by interviewing Hugo Medina yet subsequently arrived at the police station to serve in this capacity which shows a clear bias and failure to adequately advocate for the juvenile.

73. Prior to beginning the interrogation neither ULLOA or GRZEDA make any attempt to learn anything about COREY'S educational or mental health history or make any attempts to contact COREY's parents.

74. The interrogations at the Waukegan Police Department end at approximately 5:30 a.m. The COREY remains in custody and is taken in a police vehicle to assist the officers in finding the gun used in the instant offense. During this search, COREY is further questioned by police officers and makes other

statements implicating him in the charged offense. The minor was not re-advised of his Miranda rights prior to this interrogation, nor was he allowed to consult with an attorney or parent.

75. GRZEDA, CAPPELLUTI, and ULLOA all acted as Juvenile Advocates for one another to conspire and coerce COREY's false confession.

76. Upon information and belief, CAPPELUITTI and ULLOA practice "The Reid Technique of Interview and Interrogation" which has been out of favor and proven to provide false confessions, especially in minors.

77. The named Defendants had knowledge of exculpatory evidence on information and belief they knew of the true shooter but did not arrest him because he was a confidential informant. Prosecutors and officers involved knew there was no gun residue on COREY's hands.

78. The named Defendants failed to disclose misidentifications in reports to the Court or to Defense Counsel, and misrepresented eyewitness testimony as being 100% sure when COREY could not truly be identified.

79. All defendants have a pattern and practice

80. Based on information and belief, the named prosecutors continued to prosecute COREY despite coworker's pleas to drop charges because COREY was innocent of the charges.

81. Defendant officers perpetrated false identifications by suggestive show ups. The officers and prosecutors involved misrepresented the witness' identifications and suggested to witnesses to identify the Plaintiff as the shooter.

82. Officers and prosecutors filed falsified reports and/or court documents

as to the existence of probable cause against COREY with knowledge that the Court would and did rely on those representations.

83. At the time of this interrogation, the COREY was 15 years of age with a date of birth of 5/29/03.

## COUNT I

### 42 U.S.C. § 1983 - Coerced and False Confession (Fifth Amendment)

84. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

85. In the manner described more fully above, the Police Officer Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments.

86. As described more fully above, the Police Officer Defendants participated in, encouraged, advised, and ordered an unconstitutional, interrogation of Plaintiff, which caused Plaintiff to make involuntary statements implicating himself.

87. The false statements written by the Defendants and attributed to Plaintiff were used against Plaintiff to his detriment in a criminal case. These statements were the only reason that Plaintiff was arrested and charged with Murder.

88. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiffs clear innocence.

89. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

90. Plaintiffs injuries were caused by the policies, practices, and customs of the CITY OF WAUKEGAN.

91. At all times relevant to the events described in this Complaint and for a period of time prior thereto, CITY OF WAUKEGAN promulgated rules, regulations, policies, and procedures for the conduct of interrogation, testing, and questioning of criminal suspects by officers.

92. In addition, CITY OF WAUKEGAN promulgated rules, regulations, policies, and procedures for the training and supervision of officers, with respect to the conduct of interrogations and the techniques to be used when questioning criminal suspects.

93. Moreover, CITY OF WAUKEGAN provided training and training materials to Officers on the subject of criminal interrogations. The Waukegan police department adopted these rules, regulations, policies, and procedures, such that they became the policies and procedures of the Waukegan Police Department.

94. Defendant officers implemented these rules, regulations, policies, and procedures.

95. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto THE CITY OF WAUKEGAN had notice of a widespread practice that officers routinely coerced individuals against their will to implicate themselves in crimes that they had not committed. It was common that suspects interrogated in connection with investigations within the jurisdiction falsely confessed, under extreme duress and after suffering abuse, to committing crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

96. Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice among officers, employees, and agents of the Waukegan Police Department under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to the following: (1) individuals, including minors and individuals with mental disabilities and psychiatric conditions, were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical and psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to have an attorney present or to remain silent; (4) individuals were

forced to sign false statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

97. These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of THE CITY OF WAUKEGAN were directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

98. The above widespread practices, so well settled as to constitute *de facto* policy of the CITY OF WAUKEGAN, were able to exist and thrive because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

99. In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of CITY OF WAUKEGAN in that the constitutional violations committed against Plaintiff were committed

with the knowledge or approval of persons with final policymaking decision or were actually committed by persons with such final policymaking authority.

100. The policies, practices, and customs set forth above have resulted in numerous well-publicized false confessions, including the false confession at issue in this Complaint, in which individuals were charged with and incarcerated for crimes that they did not commit after being subjected to abusive interrogation techniques.

101. Plaintiffs injuries were caused by officers, agents, and employees of the CITY OF WAUKEGAN, including but not limited to the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT II

### 42 U.S.C. § 1983-Coerced and False Confession (Fourteenth Amendment)

102. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

103. In the manner described more fully above, the Police Officer Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his right to due process secured by the Fourteenth Amendment.

104. As described in detail above, the misconduct described in this Count was done using extreme techniques and psychological coercion. This

misconduct was severe, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

105. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiffs clear innocence.

106. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

107. Plaintiffs injuries were caused by the policies, practices, and customs of the CITY OF WAUKKEGAN as set out in Count I, above, which were implemented by officers, agents, and employees of these entities, including but not limited to the individually named Defendants, who acted pursuant to these policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNTIII

### 42 U.S.C. § 1983 - Due Process

108. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

109. As described in detail above, the Police Officer Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived

Plaintiff of his constitutional right to a fair trial.

110. In the manner described more fully above, the Police Officer Defendants deliberately withheld exculpatory evidence from Plaintiff and from the Prosecutor Defendants, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

111. In addition, the Police Officer Defendants fabricated and solicited false evidence, including testimony that they knew to be false and perjured and fabricated police reports, implicating Plaintiff in the crime, obtained Plaintiffs conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

112. In addition, the Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

113. The Police Officer Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fifth and Fourteenth Amendments. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

114. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiffs clear innocence.

115. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

116. Plaintiffs injuries were caused by the policies, practices, and customs of Defendant CITY OF WAUKEGAN, in that employees and agents regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating criminal defendants in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a similar manner to that alleged herein.

117. The above-described widespread practices, which were so well-settled as to constitute the *de facto* policy of the CITY OF WAUKEGAN, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because CITY OF WAUKEGAN declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

118. The misconduct described in this Count was undertaken pursuant to the policy and practices of CITY OF WAUKEGAN in that the constitutional

violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the CITY OF WAUKEGAN or were actually committed by persons with such final policymaking authority.

119. The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

## COUNTIV

42 U.S.C. § 1983 - Due Process

120. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

121. As described in detail above, the Prosecutor Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

122. In the manner described more fully above, the Prosecutor Defendants deliberately withheld exculpatory evidence from Plaintiff and from the Prosecutor Defendants, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

123. Prosecutor Defendants knowingly used fabricated and false evidence, including testimony that they knew to be false including, coerced and fabricated police reports, implicating Plaintiff in the crime, obtained

Plaintiffs conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

124. In addition, the Prosecutor Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

125. The Prosecutor Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fifth and Fourteenth Amendments. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

126. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiffs clear innocence.

127. As a result of Prosecutor Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

128. Plaintiffs injuries were caused by the policies, practices, and customs of Defendant LAKE COUNTY in that employees and agents regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating criminal defendants in criminal conduct, elicited false and coerced witness testimony, pursued wrongful

convictions through profoundly flawed investigations, and otherwise violated due process in a similar manner to that alleged herein.

129. The above-described widespread practices, which were so well-settled as to constitute the *de facto* policy of the LAKE COUNTY, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because LAKE COUNTY declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

130. The misconduct described in this Count was undertaken pursuant to the policy and practices of LAKE COUNTY in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the LAKE COUNTY or were actually committed by persons with such final policymaking authority.

131. The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

## COUNTV

42 U.S.C. § 1983 - Conspiracy to Deprive Constitutional Rights

132. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

133. After the murder of Daiyon Bolden, the Police Officer, and the Prosecutor Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

134. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

135. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

136. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiffs clear innocence.

137. As a result of Police and Prosecutor Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VI

42 U.S.C. § 1983 - Failure to Intervene

138. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

139. In the manner described above, during the constitutional violations described herein, all of the Police Officer and Prosecutor Defendants stood by without intervening to prevent the violation of Plaintiffs constitutional rights, even though they had the opportunity to do so.

140. As a result of this failure to intervene to prevent the violation of Plaintiffs constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

141. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, reckless indifference to the rights of others, and in total disregard of the truth and Plaintiffs clear innocence.

142. As a result of all of the Police Officer and Prosecutor misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT VII**

State Law Claim - Malicious Prosecution

143. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

144. In the manner described above, all of the Police Officer Defendants and the Prosecutor Defendants, acting as investigators, individually, jointly, or in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

145. In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

146. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiffs clear innocence.

147. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation,

degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT VIII**

State Law Claim - Intentional Infliction of Emotional Distress

148. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

149. The actions, omissions, and conduct of all of the Police Officer Defendants and the Prosecutor Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

150. As a direct and proximate result of the Defendant Officers' actions, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages as set forth above.

**COUNT IX**

State Law Claim - Civil Conspiracy

151. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

152. As described more fully in the preceding paragraphs, all of the Police Officer Defendants and Prosecutor Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by

concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co- conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

153. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

154. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiffs clear innocence.

155. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNTX

### State Law Claim - Defamation

156. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

157. All of the Defendants each waged campaigns against Plaintiff, in which they advanced and caused to be published intentionally false and misleading

statements and lies about or concerning Plaintiff that they knew to be false, including repeatedly accusing Plaintiff falsely of murder, and in so doing committed defamation *per se.*

158. Defendants made statements that were widely published in major public newspapers distributed throughout the entire world. The things these Defendants said about or concerning Plaintiff were malicious, shocking, outrageous, and offensive, and these Defendants made these statements knowing that they were entirely false.

159. The statements made by were wholly untrue accusations of murder, which constitute defamation *per se* in Illinois.

160. These defamatory falsehoods were made with actual malice by Defendants inasmuch as they knew of their falsity or recklessly disregarded their truth or falsity.

161. As a result of Defendants' misconduct described in this Count, Plaintiff suffered injuries, including but not limited to reputational damages, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

162. In particular, the Defendants' defamatory falsehoods have and continue to injure Plaintiff in the following ways, among others: (a) by impugning Plaintiff's personal reputation in the community such that individuals who Plaintiff interacts with question whether he is a murderer; (b) by subjecting Plaintiff to harassment for a crime he did not commit.

163. The actions and omissions of Defendants demonstrate malice, egregious defamation, and insult. These Defendants' actions and omissions were undertaken either with malice, spite, ill will, vengeance, or deliberate intent to harm Plaintiff, or with reckless disregard to the falsity of the speech

and its effect on Plaintiff. Accordingly, Plaintiff is entitled to punitive damages and attorneys' fees beyond those damages, described above, that will compensate Plaintiff for injuries resulting from the Defendants' conduct.

## COUNT XI

State Law Claim - Respondeat Superior

164. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

165. While committing the misconduct alleged in the preceding paragraphs, the Defendant Officers were employees, members, and agents of the CITY OF WAUKEGAN.

166. While committing the misconduct alleged in the preceding paragraphs, the Prosecutor Defendants were employees, members, and agents of the , the Lake County State's Attorney's Office, LAKE COUNTY, Illinois.

167. Defendants CITY OF WAUKEGAN and LAKE COUNTY, Illinois, are liable as principal for all torts committed by its agents.

& Associates is liable as principal for all torts committed by its agents.

## COUNT XII

State Law Claim – Indemnification

168. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

169. Illinois law provides those public entities are directed to pay any tort judgment for compensatory damages for which employees are liable

within the scope of their employment activities.

170. The Defendants were employees, members, and agents of the CITY OF WAUKEGAN, the Lake County State's Attorney's Office, and LAKE COUNTY, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

171. LAKE COUNTY is obligated by Illinois statute to pay any judgment entered against the Prosecutor Defendants.

172. CITY OF WAUKEGAN is obligated by Illinois statute to pay any judgment entered against the Prosecutor Defendants.

WHEREFORE, Plaintiff CORINTHIAN “COREY” BURNS., respectfully requests that this Court enter a judgment in his favor and against all, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

## COUNT XIII

**Violation of 42. U.S.C. §1983 - Monell claim against Defendants CITY OF WAUKEGAN, SAM CUNNINGHAM. WAYNE WALLES, MICHAEL NERHEIM and LAKE COUNTY**

173. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

174. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto THE CITY OF WAUKEGAN, WALLES, CUNNINGHAM, MICHAEL NERHEIM and LAKE COUNTY had notice of a widespread practice that officers routinely

coerced individuals against their will to implicate themselves in crimes that they had not committed. It was common that suspects interrogated in connection with investigations within the jurisdiction falsely confessed, under extreme duress and after suffering abuse, to committing crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

175. Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice among officers, employees, and agents of the Waukegan Police Department under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to the following: (1) black and brown individuals, including minors and individuals with mental disabilities and psychiatric conditions, were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical and psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to have an attorney present or to remain silent; (4) individuals were forced to sign false statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly

supervise or discipline police officers and employees such that the coercive interrogations continued unchecked. Including but not limited to, Juan Rivera, Jerry Hobbs, Jason Strong, Calvon Walter, Juan Garcia and Giorgio Perez.

176. These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of THE CITY OF WAUKEGAN, WALLES and CUNNINGHAM were directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

177. The above widespread practices, so well settled as to constitute *de facto* policy of the CITY OF WAUKEGAN, WALLES and CUNNINGHAM, were able to exist and thrive because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

178. In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of CITY OF WAUKEGAN, WALLLES and CUNNINGHAM in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking decision or were actually committed by persons with such final policymaking authority.

179. The policies, practices, and customs set forth above have resulted in numerous well-publicized false confessions, including the false confession at issue in this Complaint, in which individuals were charged with and incarcerated for crimes that they did not commit after being subjected to abusive interrogation techniques.

180. Plaintiffs injuries were caused by officers, agents, and employees of the CITY OF WAUKEGAN, WALLES and CUNNINGHAM, including but not limited to the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count

**JURY DEMAND**

Plaintiff, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ *KEVIN W. O'CONNOR*
Attorney for Plaintiff

O'Connor Law Firm, Ltd.
Kevin O'Connor - 6216627
19 S. LaSalle Street, Suite 1400
Chicago, Illinois 60603
(312) 906-7609
firm@koconnorlaw.com